# In the United States Court of Federal Claims

### No. 03-30C

### (Filed: May 31, 2007)

* * * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| **P.R. CONTRACTORS, INC.,** | **Contract Disputes Act, 41 U.S.C. §§ 601 et seq.; Jurisdiction; Contracting Officer Final Decision; Contract Interpretation; Parol Evidence; Variation in Estimated Quantity.** |
| **Plaintiff,** | |
| **v.** | |
| **THE UNITED STATES,** | |
| **Defendant.** | |

* * * * * * * * * * * * * * * * * * * * * * * * ** * * * *

Winston G. DeCuir, Sr., DeCuir, Clark & Adams, LLP, 732 North Blvd., Baton Rouge, LA, for Plaintiff.

Sharon A. Snyder, Department of Justice, Commercial Litigation Branch, Civil Division, 1100 L Street, NW, 8th Floor, Washington, D.C., for Defendant; William G. Meiners, United States Army Corps of Engineers, New Orleans, LA, Of Counsel.

---

## OPINION

---

**WILLIAMS**, Judge.

Plaintiff, P.R. Contractors, Inc. (PR), seeks to recover additional costs totaling $865,156 that it claims to have incurred under its contract with the Army Corps of Engineers (Corps) for a levee enlargement in Louisiana (the Contract). Plaintiff's claim includes five components: 1) labor wage rate variances, 2) increased trucking costs, 3) material shrinkage, 4) quantity under-run and 5) additional fill due to settlement.

Plaintiff failed to prove that during negotiations the Corps agreed to compensate it for any increased labor or trucking costs it might incur above those in its proposal. Plaintiff likewise failed

to prove that the Government estimate erroneously excluded a factor for shrinkage in the estimated quantities.  Plaintiff cannot recover for a quantity under-run under the Variation in Estimated Quantity (VEQ) clause because it failed to demonstrate that the under-run resulted in any additional costs.  Finally, Plaintiff cannot recover for additional fill due to settlement because it did not calculate the quantity of additional fill it used in accordance with the methodology in the Contract.  Plaintiff was obligated to retrieve settlement plates in order to measure the level of settlement, but lost the plates and forfeited its right to recover under the Contract.  As such, Plaintiff's claim is denied.

### Findings of Fact[1]

On June 14, 1996, the Corps issued request for proposals number DACW29-96-R-0025 to the Small Business Administration (SBA) under the SBA's 8(a) program.  DX 11.[2]  The Corps sought a contractor to perform levee enlargement construction for the project referenced as the Atchafalaya Basin, Levees West of Berwick, Wax Lake West "B" Levee Enlargement and Berms, Station 625+00 to Station 948+00, St. Mary Parish, Louisiana.  Id.  Plaintiff was the small business contractor selected for this project.  Id.  The Contract was not awarded through a competitive bidding process; after Plaintiff was awarded the Contract, negotiations to establish the price began.  Tr. at 42-43.

On July 17, 1996, the Government prepared its estimate of reasonable contract costs concluding that the project would cost $2,618,592.  Def.'s Ex. 1; Joint Stipulations of Fact (Stip.) ¶ 3.  The Government's estimate was based on costs related to hauling uncompacted and

---

[1]  These findings are based on the record developed during the trial in Baton Rouge, Louisiana, from February 7, 2006 through February 9, 2006.  In addition, the Court admitted the de bene esse deposition of Lin Heath, an engineer who prepared Plaintiff's claim, conducted on June 27, 2006.

[2]  The SBA is the prime contractor in section 8(a) projects and worked with the Corps to identify Plaintiff as an appropriate subcontractor.  Tr. at 408-10.  The SBA's section 8(a) program was established to "promote the viability of socially and economically disadvantaged small business concerns by empowering the [SBA] to enter into contracts with other federal agencies and 'to arrange for the performance of such contracts by negotiating or otherwise letting subcontracts to small business concerns.'" Baker v. Dep't of Health and Human Services, 912 F.2d 1448, 1450 (Fed. Cir. 1990) (quoting Baillie Trash Hauling, Inc. v. Kleppe, 477 F.2d 696, 702 (5th Cir. 1973), cert. denied, 415 U.S. 914 (1974)); 48 C.F.R. §19.800(a).   Through this program, contracts can be awarded via a noncompetitive award process where the contractor is evaluated on its technical capabilities.  Baker, 912 F.2d at 1450; 48 C.F.R. § 19.800(b).  See Urban Data Sys., Inc. v. United States, 699 F.2d 1147, 1155 (Fed. Cir. 1983), see also In re Exquisito Services, Inc., 823 F.2d 151, 154 (5th Cir. 1987) ("Because of the strong policies inherent in the 8(a) program, contracts may be awarded without competition, and at rates higher than those at which a non-8(a) business could perform.").

semicompacted fill, clearing, grubbing, fertilizing, seeding, installation of sheetpile over the pipeline, and levee crown surfacing.  Def.'s Ex. 1.  The Government estimate took into account shrinkage of fill material.  Id.; DX 8/14-18; Tr. at 527-41, 643-44.

## The Negotiations

Plaintiff initially proposed to perform the Contract for $4,930,183.44, but this proposal was rejected by the Corps as being outside the negotiable range.  Tr. at 44-45.  On July 17, 1996, Plaintiff submitted a proposal for $3,914,524.54, which incorporated a subcontractor's estimate for the cost of the project along with Plaintiff's expenses, profit, and overhead.  Def.'s Ex. 2; Pl.'s Ex. 3; Tr. at 47. [3]  This bid was also rejected by the Corps as being outside the negotiable range.  Pl.'s Ex. 2 ; Tr. at 45-46.  After this rejection, Plaintiff received an unsolicited bid from a potential subcontractor, Anthony Buras of H&B Construction Co. Of La., Inc. (H&B).  Tr. at 47-48; Pl. Ex. 2.[4]  Cedric Patin, the president of PR, did not know Mr. Buras and believed that the Corps referred Mr. Buras to PR.  Tr. at 47-48.  No representative from the Corps confirmed that Mr. Buras was referred to Plaintiff by the Corps, and the circumstances under which Mr. Buras' bid was transmitted to PR remain a mystery.  Tr. at 48, 572, 815.  On September 3, 1996, Plaintiff submitted a third proposal of $3,225,369.81, which included H&B's bid plus Plaintiff's overhead, profit, and supervisory costs.  Because this proposal was within an acceptable range of the Government estimate, negotiations commenced.  Pl.'s Ex. 2; Tr. at 46-47, 49-54.  Negotiations took place between September and November, 1996.  Pl.'s Ex. 2.

## The September 12, 1996 Negotiation Session

A negotiation meeting was held on September 12, 1996.  Id.  The Corps was represented by a senior construction manager, two cost engineers and its small and disadvantaged business utilization advisor.  Mr. Bivona, the senior cost engineer, was the lead negotiator regarding engineering and Mr. Standige, the small and disadvantaged business utilization advisor, was the lead negotiator regarding contracting.  Tr. at 475, 498, 515, 584, 812.[5]  Plaintiff was represented by Cedric Patin and Anthony Buras.  Pl.'s Ex. 2.  Mr. Buras had worked with the Corps before and was well received at the negotiation.  Tr. at 61, 572-73, 576.

---

[3]  Although Plaintiff submitted a "proposal" here since this was a negotiated procurement, the testimony and documentary evidence use the terms "proposal" and "bid" interchangeably.

[4]  Mr. Buras died prior to trial.  Tr. at 131.

[5]  Mr. Bivona has been employed with the Corps since 1973.  Tr. at 497.  He is a licensed structural engineer and is currently the acting chief of the Geotechnical Branch in the Corps' New Orleans District -- a position he assumed after Hurricane Katrina.  Tr. at 496.  Mr. Standige, who is no longer working for the Corps, was not called as a witness, although counsel for the Government provided his contact information to counsel for Plaintiff.  Def. Resp. to Pl. Post-Trial Brief, Ex. 2.

During this meeting, the Corps representatives informed Mr. Patin that PR's wage estimate and its additions to H&B's estimate were too high. Pl. Ex. 2; Tr. at 53-54. Mr. Bivona testified as follows regarding the first negotiation session:

> A.   It was understood just like the record says that we were more concerned with the add-ons by the prime contractor, that the subs' prices particularly for dirt were adequate, were reasonable.
>
>      . . . .
>
> Q    Do you recall what the discussions regarding wages were with P.R.?
>
> A.   No. I simply would say that in some areas, he had higher wages than the government estimate and we just brought it to his attention to perhaps do some research and try to bring to light some supportive documentation rather than just a stated hourly figure.
>
> Q.   Do you recall any specifics about what the government believed was higher than the wages it should be paid in the area?
>
> A.   No. . . . well, prior to the second [negotiation], we did do the research . . . where we asked the Lafayette area office to fax us payrolls, and we felt the only area of movement after reviewing the payrolls would be the common laborer, upping it by 50 cents an hour.

Tr. at 579-82. DX 49. As a result of reviewing the additional information received from the Lafayette area office, the Corps increased the wage rate for common laborer from $6.50 per hour to $7.00 per hour in the final Government estimate. DX 8/2.

On September 16, 1996, the Government revised its estimate to $2,785,651. Pl.'s Ex. 2. Plaintiff subsequently revised its proposal to $3,138,206.18, but was informed that the revision was not sufficient to warrant additional negotiations. Id. This reduction in Plaintiff's proposal reflected the deletion of costs associated with transportation bridges, which by agreement of the parties, were to be omitted from the project. Tr. at 57-59. On September 23, 1996, Plaintiff revised its proposal to $2,945,357.41. Pl. Ex. 2.

4

**The November 4, 1996 Negotiation Session**

A second negotiation session was held on November 4, 1996.  Pl.'s Ex. 2.  At this meeting Plaintiff was represented by Mr. El Centro Coffey, the Acting Assistant District Director for Finance and Investments of the SBA's New Orleans District Office, as well as by Mr. Patin.[6]  The Government was represented by Messrs. Bivona, Standige, and Reeves and three other individuals.[7]  Id.; Tr. at 59, 806, 812.  Plaintiff claims that during this session, the Corps stressed that Plaintiff had to complete the project at or below H&B's estimate.  Tr. at 53, 60-61.  Mr. Patin testified that when he reviewed his estimate for the project with the Corps representatives, they told him:

> A.      You need to go back and look at this, . . . we have a subcontractor who is willing to do the job for this amount. This is what we're going to let you have to do the work.
>
> . . .
>
> Q.      And they were referring to Mr. Buras?
>
> A.      Mr. Buras.
>
> Q.      But you wouldn't accept Mr. Buras?
>
> A.      Well, it's not that I wouldn't accept him. They wouldn't let me put in any overhead and profit and the other things that were necessary on the -- add on to his numbers in order to be able to make a decent profit and put the right supervision out that we felt was the right supervision out on the project, and he was going to be doing the whole job and we didn't want to let him do that.

Tr. at 60.

Mr. Bivona characterized the discussion at the second negotiation as follows:

> Q.      What was discussed during the second negotiation?  What specifically and why?

---

[6]  According to Mr. Coffey, the SBA is involved in the beginning and the end of the negotiation process in order to provide some guidance, but does not attend all negotiation sessions. Tr. at 411.

[7]  Mr. Reeves was a construction manager for the Corps.

5

A.     It was primarily the add-ons.  We were very, very close.  We talked contract duration.  We talked that we were going to move on the wage rate, so I knew that we would be moving up, and we asked the contractor to consider his markups because the fact that Dickey Buras' company was doing seven of the 10 jobs, and perhaps that could give us some movement and a potential award, so we call it in the estimating field the add-ons, the add-ons to the subcontractor's work by the prime.

Q.     And when a prime uses a subcontractor for part of the work, can that have an impact on the proposal that the contractor submits?  Is that what you're suggesting?

A.     Yes.  In areas where we call them sometimes a double markup.  For example, if the supervision is incurred in the subcontractor's dollars, obviously minimal supervision should be incurred by the prime.  Likewise, on profit, if the sub is responsible for the majority of the work under a subcontract agreement, then the prime should back off on that profit.  It's just recognized as prudent estimating in construction contracts to be successful.

Tr. at 585-86.

## The Discussion of Labor and Trucking Rates During the Negotiations

### Labor Rates

Plaintiff alleges that during negotiations, the Corps insisted that labor was available in the area at Davis-Bacon wage rates and that Plaintiff therefore reduced its estimated labor costs down to the Davis-Bacon levels.[8]  Tr. at 135.  Specifically, Mr. Patin testified that Plaintiff incorporated Davis-Bacon rates into its bid during negotiations after the Corps told it that, with the exception of laborer rates, Davis-Bacon wage levels were the only acceptable rates.  Tr. at 134-35.  However, Plaintiff's proposals do not reflect that it actually used Davis-Bacon rates.  See DX 2, 3, 5, 6 and 7.  To the extent Plaintiff's proposals in the record reflect labor rates, these rates exceed Davis-Bacon

---

[8]  The Contract required that PR pay its workers no less than wage rates prescribed by the Davis-Bacon Act.  DX 11/61-62.  The wage rates paid by Plaintiff and the Davis-Bacon rates for the various categories of labor used on the project are listed in Plaintiff's Claim for Equitable Adjustment.  Pl.'s Ex. 4.

rates.  Id.  The Government estimate also contained wage rates above the Davis-Bacon rates.[9]  Tr. at 562; Pl.'s Ex. 4.  For example, PR's rate for a dozer operator was $22.50 per hour, while the Government estimate was $17.55 per hour and Davis-Bacon rate, $11.91 per hour.  Compare DX 2, 3, 5, 6, and 7 with DX 1, 5, 8 and Pl. Ex. 4, Schedule I.A.

Trucking Rates

Mr. Patin testified that he was informed by the Corps that if PR's bid price incorporated trucking rates above $30 per-hour, PR's bid would not be considered to be in good faith and negotiations would end.  Tr. at 137-38.  Mr. Patin claims to have based PR's bid on what he termed the Corps' trucking rate of $30 per hour.  Id. at 138.  Mr. Patin testified that during the negotiation sessions he was assured that if PR could not fulfill the trucking requirements at the Corps' $30 per-hour rate, PR would be reimbursed for the resulting rate variance.  Id.  at 67-70.  PR ultimately paid an average trucking rate of $40 per hour in completing the project.[10]

The Corps' estimate incorporated trucking rates of $49.94 per hour  -- $12.76 per hour per driver for labor and $37.18 per hour for the equipment rental.  Tr. at 548; Pl. Ex. 8.  Plaintiff's bids and the accompanying documentation do not reflect what trucking rate PR used in its bid, and there is no documentary evidence indicating that Plaintiff's bid was based on a $30 per-hour rate.  See DX 2, 3, 5, 6 and 7.  Mr. Bivona testified that because the dirt work and the trucking were being done by the subcontractor and were subsumed in the subcontractor's overall price, a discussion of trucking rates never came up during negotiations.  Tr. at 622.

Mr. Bivona credibly testified that he never told PR that it had to utilize certain rates when preparing its bid:

> . . . I don't mandate.  The negotiating team don't [sic] mandate.  We bring to light differences between the proposal and the government estimate.
>
> If, for example, the contractor wants to consider indirects and leave the directs alone even though we feel they're unreasonable, that's fine.  It's just to highlight differences in areas where hopefully there would be some movement, indirects or directs.  Nowhere ever have

---

[9]  The labor rates for the Government estimate were based upon the location and complexity of the work, historical data for similar type work in the area, review of payrolls, as well as Davis-Bacon rates.  Tr. at 563.

[10]  Plaintiff is no longer in possession of its records of trucking rates actually paid because the documents were destroyed during Hurricane Katrina.  Tr. at 113-15.

> I ever mandated anyone, anyone, to do this or do that.   It's
> recommendations, it's considerations, and it's considerations both
> direct and indirects as possibility of movement.

Id. at 580-81.

The SBA official who was representing PR in these negotiations, Mr. Coffey, testified about the discussion of trucking rates as follows:

> Q.      And what do you recall about the trucking and truck rates?
>
> A.      I recall that P.R. Contractors was the opinion [sic] that the
>         rates and the charges that they were facing were rates that they
>         had estimated for the job, and their rates did not compare with
>         that that the government, the Corps of Engineers in this case,
>         had indicated what the prevailing rates would be for that work
>         in that area where this job was being performed.
>
> Q.      Okay.  And what did they discuss about those rates?  Do you
>         recall?
>
> A.      All aspects of it.  For [sic] what I can recall, it was a matter of
>         both parties explaining how they came about their rate
>         structure and cost, and I think it ended up that P.R.
>         Contractors' position was the rates that the government had
>         were not rates that they were able to identify for working in
>         that area, that P.R. Contractors, with their estimate, were
>         paying what the government if I remember saying was
>         premium for that aspect of the work, and Cedric Patin's
>         position was that's the price that I have to pay in order to get
>         people to work for us in that area.

Tr. at 419-20.[11] Mr. Coffey further testified that the Corps agreed to exchange information regarding sources of lower trucking rates, but he was unaware if Plaintiff ever received this information.  Tr. at 421-22.  Mr. Coffey did not testify that the Corps required Plaintiff to use a $30 per-hour trucking rate in its bid -- he did not mention that any hourly rate was prescribed.  Tr. at 406-46.[12] Mr. Coffey

---

[11]  Mr. Coffey's testimony was based solely upon his recollection of a meeting held almost 10 years previously.

[12]  There is no reference in the Record of Negotiation to any discussion regarding trucking rates.  Pl.'s Ex. 2.  Mr. Bivona testified that he believed E.C. Coffey, the SBA representative, was confusing the trucking on this job with the trucking on another job PR had in Plaquemines Parish,

did not testify about any promise by the Corps to grant PR an equitable adjustment for labor or trucking rates.  Id.[13]

Both John Bivona, the Corps' senior cost engineer in the cost estimating branch, and Mr. Reeves, a Corps' construction manager and negotiator, credibly testified that Corps representatives did not tell Mr. Patin that PR would receive an equitable adjustment if it incurred additional labor costs and trucking costs above those bid.  Id. at 577, 593-94, 816.

**Plaintiff's Final Proposal**

In November of 1996, shortly after this second negotiation session, the Corps revised its price to $2,920,619.20.  Stip. ¶ 10; DX 10/2.  Plaintiff then revised its proposal from $2,945,357.41 to $2,920,084.61.  Stip. ¶ 10.  Plaintiff claims that it submitted this proposal because it was told that the Corps would not accept a proposal that exceeded the estimate of H&B.  Tr. at 66-67.  Cedric Patin testified:

> A.    . . . as it pertains to the final number, the reason why this got to this final number is the Corps told me just basically -- again flat-out that if you don't, we've got a contractor who can do the price for this.  You either let him do it or you do it for that price, and if it goes over $3 million, the negotiations are over with anyway.
>
> Q.    Who told you that?
>
> A.    Mr. Standige and Mr. Bivona; that they could not award a contract under the SBA over $3 million.

Id.

Mr. Patin's testimony that PR was forced to lower its bid to H&B's price in order to obtain the Contract is not corroborated by any other evidence.  Plaintiff's witness, Mr. Coffey, the SBA representative, was present at the final negotiating session, but did not testify on this subject.  Mr. Reeves, a construction manager with the Corps who was on the Corps' negotiating team, testified that the Contract did not have to be in any particular price range.  Tr. at 818-19; see Tr. at 810-12.

**The Contract**

The Government awarded the contract for the Wax Lake project to the SBA on December

---

Louisiana.  Tr. at 651-52.

[13] Mr. Coffey was called by Plaintiff as a witness, not by the Government.

12, 1996, and the SBA immediately subcontracted performance of the Contract to PR.  Stip. ¶ 11; DX 11; Pl.'s Ex. 1.  PR did not use H&B or Mr. Buras as its subcontractor.  The Contract was a firm fixed-price contract for $2,920,030.93 and stated that "[t]he government shall pay the contractor the contract price as provided in this contract."  DX 11/1 and 107.[14]

The Contract listed 10 line items as follows:

### SECTION 00010 - BIDDING SCHEDULE

| Item No. | Description | Estimated Quantity | Unit | Unit Price | Est. Amt. |
|---|---|---|---|---|---|
| 0001. | Mobilization and Demobilization | Lump Sum | LS | | |
| 0002. | Clearing and Grubbing | Lump Sum | LS | | |
| 0003. | Borrow Pit Development | Lump Sum | LS | | |
| 0004. | Construction Dikes | Lump Sum | LS | | |
| 0005. | Embankment, Uncompacted Fill | 222,000 | CY | | |
| 0006. | Embankment, Semicompacted Fill | 145,000 | CY | | |
| 0007. | Levee Restoration | Lump Sum | LS | | |
| 0008. | Fertilizing and Seeding | 93 | AC | | |
| 0009. | Surfacing | 4,300 | CY | | |
| 0010. | Piling, Steel Sheet, Type PZ 22 | 1,610 | SF | | |
| | | | TOTAL | $_____ | |

DX 16/6.  The Contract did not include a separate line item for labor or trucking.  Id.  As this bidding schedule reflects, five items were to be priced on a lump-sum basis, and five items with estimated quantities were to be priced on a unit-price basis.  Id.  Specifically, the Contract included estimated quantities of uncompacted and semicompacted fill and surfacing that were to be priced per cubic yard.  Fertilizing and seeding were to be priced per acre, and piling and steel sheet, per square foot.  Id.  The Government's senior cost engineer, Mr. Bivona, explained:

> Unit pricing is when the owner, in this case the government, and the contractor share in the risk.  That is, the owner, being the government or the Corps, is stating a quantity.  The minute you state a quantity, then you're bound to pay on that quantity, and of course it's

---

[14]  The discrepancy between Plaintiff's final offer and the Contract price is attributable to changes in unit pricing not at issue here.  DX 20.

> understood that a quantity is never the exact quantity. For example,
> you're not going to get right down to the units, so there is a provision
> in the contract called variation in estimated quantities whereby that
> bid price on a unit price line item holds for 15 percent above and
> below. Beyond that window, there could be -- could be -- a change
> if requested and negotiated and understood through the contract
> admin office.

Tr. at 511-12.

> The Contract incorporated the FAR provision governing VEQ as follows:

> If the quantity of a unit-priced item in this contract is an estimated
> quantity and the actual quantity of the unit-priced item varies more
> than 15 percent above or below the estimated quantity, an equitable
> adjustment in the contract price shall be made upon demand of either
> party. The equitable adjustment shall be based upon any increase or
> decrease in costs due solely to the variation above 115 percent or
> below 85 percent of the estimated quantity.

DX 11/43. The quantities of uncompacted and semicompacted fill spelled out for the embankment
work in line items 5 and 6 of the Contract were estimates subject to the VEQ clause. DX 11/5.

The Contract contained the following standard FAR clauses:

(a)   52.222-6: Davis-Bacon Act (Feb. 1995), providing rule
      regulating the employment and payment of workers on the
      project.

(b)   52.236-16: Quantity Surveys (Apr. 1984), providing specific
      requirements for computing the quantities of work performed
      and the actual construction completed and in place.

(c)   52.236-3(a): Site Investigation and Conditions Affecting the
      Work (Apr. 1989), providing:

> The contractor acknowledges that it has taken steps
> reasonably necessary to ascertain the nature and location of
> the work, and that it has investigated and satisfied itself as to
> the general and local conditions which can affect the work or
> its cost, including, the availability of labor.

> and

11

(d)     52.236-3(b): Site Investigation and Conditions Affecting the Work (Apr. 1989), providing that the contract represents the entire agreement reached by the parties.

DX 11/61-63; DX 11/160; DX 11/124.

The Contract specified mandatory procedures the contractor had to follow to secure payment for additional fill placed at the site due to settlement of the foundation during construction. Paragraph 12, SETTLEMENT OF FOUNDATION, provided in pertinent part:

12.1    Should the Contractor desire payment for placing additional fill due to foundation settlement during construction, he shall furnish and install settlement gages for determination of such settlement. Prior to placing of fill material, each gage shall be installed on the prepared foundation of the location shown on the applicable typical cross section at intervals not to exceed 300 feet, and shall be maintained during construction. Settlement gages at each end of the work shall be placed within 150 ft. of the upper and lower limits of the work. . . . The contractor shall determine elevations of the gages prior to placing of fill material, and again within 72 hours after compliance cross sections have been taken over the completed embankment at the sites of the gages to determine settlement of the foundation. The 72 hour requirement is an absolute pre-condition for payment for settlement of the foundation. The initial and final elevation of the gages will be verified by the Contracting Officer's representative at the site. Measurement of additional fill material placed by reason of settlement of the foundation will be as stated in paragraph 15.

DS 11/291

Paragraph 15, MEASUREMENT, provided in pertinent part:

15.1.2 Measurement of additional fill material placed in each settlement measurement range shown on the drawings by reason of foundation settlement, will be based on measurements on the respective settlement gage installed as specified in paragraph 12.1 and will be determined as follows:

(1) The settlement measured at each settlement gage will be considered to apply to the foundation area throughout

12

> the length of the settlement ranges specified herein which [sic] the gage is located. . . . Further, in instances where settlement plates have been set and cannot be found after completion of the embankment, no measurement for settlement will be made and any payment which may be due the Contractor for the settlement range applicable to that settlement gage will be forfeited.

DX 11/293.

The Contract contained another express forfeiture provision precluding payment for settlement if the Contract's provision on measurement were not followed:

> 16.   Forfeiture of Payment for Settlement of Foundation.
>
> Failure to utilize settlement gages in strict accordance with the specifications and drawings will result in total forfeiture of any payment which may otherwise be due the Contractor for settlement of the foundation.  In each case of 1) failure to recover any settlement gage, 2) construction of embankment over a settlement gage in excess of specified construction lines plus the tolerance permitted under paragraph 11, or 3) failure to comply with the 72 hour requirement in paragraph 12.1, for determining gage elevations, payment will be totally forfeited for the reach attributable to each gage so affected.

DX 11/294.

**Performance**

Domingo Elguezabal, a licensed civil engineer with a masters degree in construction management was the Corps' area engineer for this project.  Tr. at 207.[15]  In this capacity, Mr. Elguezabal had primary responsibility to oversee the contractor's operation to make sure that performance was in accordance with the plans and specifications.  Tr. at 208.   He approved submittals and payment estimates and was able to modify the Contract in an amount up to $100,000.  Id.  Mr. Elguezabal also served as the Administrative Contracting Officer but did not participate in the negotiations.  Tr. at 211-12, 216.

During the performance of the work, there were numerous problems at the job site, primarily involving two employees, a surveyor hired by PR and the Government's inspector.  Tr. at 82.  PR

---

[15]  Mr. Elguezabal is now retired and testified for Plaintiff.

also had problems with its subcontractor, Mel-Grave, which resulted in a three-month delay to the job.  Tr. at 253-55.

### The Surveyor

Mr. Patin hired Stacy Case, an ex-Corps employee to be the surveyor for the project at the Government inspector's suggestion.  Tr. at 84-86; Tr. at 250.  This Government inspector, Mr. Drinkwater, and Mr. Case were neighbors.  Tr. at 303.  Mr. Patin hired Mr. Case despite concerns Mr. Elguezabal expressed about Mr. Case's reliability and honesty.  Id.  at 251; Pl. Ex. 8 at 2.[16] James Siffert, the Corps' project manager, testified that he also advised Mr. Patin about the surveyor:

> Q.  Did you talk to Mr. Patin about Mr. Case at some point?
>
> A.  Yes, I did before the job started.  Mr. Patin was telling me some of his concerns about having an available surveyor to start the job off.  He asked me if we knew anyone or could recommend anyone, and I told Mr. Patin that while I knew someone, that I couldn't honestly recommend him because the person I knew had a drinking problem.  And I explained to him who he was, that it was Mr. Case, that he actually physically lived in the vicinity of the job site there, but that to the best of my knowledge on previous jobs that he had started as a contractor's surveyor, he had never completed them through one issue or another.  He had never been able to maintain steady work through the completion of the job, and that it was my concern that if he hired Mr. Case, that that was going to be the same situation here.  But I did give him a point of contact. . . .
>
> Q.  Was Mr. Patin aware of the concerns that you had about Mr. Case before he hired Mr. Case?
>
> A.  Yes, he was.  I'd had an extensive conversation with Mr. Patin about that.
>
> Q.  Was there a problem at some point with Mr. Case's work at the Wax Lake job?
>
> A.  Yes, there was.

---

[16]  Mr. Elguezabal testified that Mr. Case "was asked to leave the Corps because of some payroll fraud that he committed."  Tr. at 250.

. . . .

Well, he had a drinking problem, and it got to be to the point
where he wasn't reliable.  He wasn't coming to work and
couldn't depend on him to be there when they needed him to
stake out the levee toes and things like this.  And eventually
P.R. Contractors let him go.

Tr. at 918-19.[17]

This surveyor was responsible for recording the location of settlement plates that were
required to be recovered after the completion of the project in order for the contractor to be
compensated for additional fill material due to settlement.  Tr. at 84; Pl.'s Ex. 1.  Mr. Case was
Plaintiff's only employee who had all of the information regarding the location of settlement plates.
Tr. at 303-04.  After the surveyor was fired by PR, Plaintiff was unable to locate the log books
containing the locations of the plates, and Plaintiff could not locate 81 of the 157 settlement plates
or determine the amount of additional fill material placed in areas where plates were lost.  Id. at 82-
84, 86, 88-89, 121-22, 303.  Pl. Ex. 4.[18]

The project was completed and accepted by the Corps as of October 24, 1998.  Stip ¶ 12.
The Contract was completed 23 days late, resulting in an assessment of liquidated damages in the
amount of $20,930 against PR.  Pl. Ex. 8 at 1.

**Mr. Elguezabal's "Change Proposals"**

In December 2000, the area engineer instructed Mr. Elguezabal to "come up with a
resolution of the issues" surrounding the project.  Tr. at 218.[19]  To that end, Mr. Elguezabal prepared

---

[17]  Plaintiff's construction manager, Mr. Hage, testified that PR did not use Mr. Elguezabal
as a reference before hiring the surveyor.  Tr. at 312.  Rather, he believed PR was warned about this
surveyor after he was hired.  Id.  Based upon the demeanor of the witnesses, the Court credits the
testimony of Messrs. Elguezabal and Siffert on this point.

[18]  There was also testimony by Mr. Elguezabal that the settlement plates were placed in the
wrong location in the first place because the project engineer thought the drawings did not indicate
where to put the plates.  The project engineer made a decision in the field about placement.  Tr. at
259-60.  A few months later, this engineer admitted he "screwed up" because the drawings did
indicate the locations.  Id. at 260.  According to Mr. Elguezabal the plates were not put in the best
locations.  Id.

[19]  While the proposals purport to discuss a "claim" of PR, the "claim" as described by Mr.
Elguezabal is different in several respects from the claim submitted to the CO and now before the
Court.  The claim described by Mr. Elguezabal did not reference PR's claimed amount and
recommended payment for three items -- trucking, the under-run and material shrinkage.  The initial

two proposals dated February 25, 2000, and October 5, 2001, recommending that the Corps settle PR's claims for $765,097.33.[20]  Pl.'s Exs. 8 and 9; see Tr. at 217-20.  In his proposals, Mr. Elguezabal explained:

> Mr. Cedric Patin, representing P.R., has stated that the company [Plaintiff] suffered losses as a result of:
>
> a) interference by the Government and collusion between the subcontractor . . . and the Government inspector, preventing [Plaintiff] from managing the project;
>
> b) directions by field personnel to hire a particular surveyor;
>
> c) failure by the Government to properly inform the contractor of the impact the subcontractor operations were having on the settlement plates; and,
>
> d) misleading information given to the contractor during negotiations that led him to believe that truckers would be available for less than actually possible.

Pl.'s Ex. 9.[21]  Mr. Patin indicated a willingness to settle all claims for $475,000 plus $2000 held as retainage, and Mr. Elguezabal recommended this settlement to his supervisor.  Tr. at 230.  Mr. Elguezabal did not have authority to settle a claim of this magnitude on his own, and his supervisor did not agree with his recommendation.  Id. at 265-67, 280.

**The Contracting Officer's Final Decision**

Plaintiff filed a claim for an equitable adjustment on April 16, 2001, which was submitted

---

proposal was prepared by Mr. Elguezabal prior to the time PR filed the subject claim on April 16, 2001.  Pl. Ex. 4.

[20]  Mr. Elguezabal did not know Mr. Patin at the time he made these recommendations but subsequently worked for Mr. Patin's father's construction company for two months in 2005, when Mr. Patin also worked there.  Because he is now working as a consultant, Mr. Elguezabal may again seek employment from Mr. Patin's father.  Tr. at 242.

[21]  Mr. Patin testified that Mr. Elguezabal recommended that Plaintiff refrain from filing an interference claim advising that it would be easier to resolve a claim for equitable adjustment after the completion of the project without an interference claim.  Tr. at 196-97.  Mr. Elguezabal himself did not testify about whether he advised PR to refrain from filing an interference claim.  Tr. at 206-98.

to the contracting officer, Diane Pecoul.  Stip. ¶ 13; Pl.'s  Ex. 4.[22]  Ms. Pecoul forwarded Plaintiff's claim to the Corps construction division where it was initially reviewed by Mr. Reeves. Tr. at 476.  Shortly thereafter, the claim was denied.  Pl.'s Ex. 5.  Ms. Pecoul acknowledged that others drafted the bulk of her decision, but she reviewed it and agreed with the conclusion.  Id. at 478-81, 870-71.

## Discussion

**Increased Labor And Trucking Costs**

Plaintiff claims that Corps' representatives forced it to lower its bid in order to receive the Contract and promised PR equitable adjustments to cover unrecouped labor and trucking costs during performance.  Specifically, PR claims that the Corps promised during negotiations that if PR could not obtain labor at the Davis-Bacon wage rate levels, the Corps would grant it an equitable adjustment for the differential between the Davis-Bacon rates it bid and the rates it actually paid.  Plaintiff contends that the Corps made a similar promise regarding trucking costs -- that if its trucking costs exceeded the rate of $30 per hour it bid, the Corps would make up the difference via an equitable adjustment.  PR claims to have incurred labor and trucking costs well above those in its proposal, seeking $145,172 in increased labor costs and $168,074 in increased trucking costs.  There are both legal and factual impediments to Plaintiff's recovery on these claims.

**Extrinsic Evidence**

Plaintiff admits that its written contract does not contain a provision authorizing payment of costs over and above the labor and trucking costs it factored into its bid.[23]  The Contract clearly addressed the price, stating "the government shall pay the contractor the contract price as provided in this contract."  DX11/107.  Further, the Contract contained firm, fixed, lump-sum prices for five line items for enumerated construction tasks and unit prices for five line items with estimated quantities -- 1) 222,000 cubic yards (CY) of uncompacted fill, 2) 145,000 CY of semi-compacted fill, 3) seeding and fertilizing for 93 acres, 4) 4,300 CY of surfacing and 5) 1,610 square feet (SF) of steel sheet piling.  The unit-price estimated-quantity line items could be altered under the VEQ clause if the actual quantities were 15% above or below those estimated and if the variation affected costs.  Thus, both types of pricing in the Contract were clear, and the risk that the Contract could be performed at the price bid was on PR except as delineated in the VEQ clause.  As commentators have recognized:

> Risks are broadly allocated by the selection of the pricing arrangement reflected in the contract type.  Thus, under cost-

---

[22] Ms. Pecoul had no understanding of the work being done from a technical standpoint and had a high school education.  Tr. at 448, 483-84, 488-90.

[23] The Contract contained fixed-price line items and line items with unit pricing based upon estimated quantities subject to a VEQ clause.  It was not a cost-reimbursement contract.

> reimbursement contracts the government accepts the risks of
> increased costs, delays, and nonperformance, while under firm-fixed-
> price contracts the contractor bears the majority of these risks.

J. Cibinic, R. Nash, & J. Nagle, Administration of Government Contracts 245 (4th ed. 2006).

Pricing for labor and trucking was nowhere spelled out in the Contract, and no contractual provision authorized compensation for either labor or trucking costs above those in the contractor's proposal.[24] Moreover, under the Contract's site investigation clause, PR acknowledged

> that it has taken steps reasonably necessary to ascertain the nature and
> location of the work, and that it has investigated and satisfied itself as
> to the general and local conditions which can affect the work or its
> cost, including . . . the availability of labor.

DX11/124 (emphasis added).  Thus, Plaintiff had the contractual obligation to "satisfy itself" as to labor and trucking availability which could "affect the cost" and factor into its pricing.  Under the clear terms of the Contract, Plaintiff cannot recover for increased labor or trucking costs.

Apparently recognizing this, Plaintiff relies upon oral promises it claims were made during negotiations preceding award -- evidence extrinsic to the four corners of the Contract.  The Government argues that the parol evidence rule bars the admission of evidence that contradicts language in the contract or adds to a completely integrated agreement, citing Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004).  See McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1434 (Fed. Cir. 1996).  However, the parol evidence rule does not preclude the Court from considering extrinsic evidence of promises during negotiations where the claimed promises call into question the mutuality of assent reflected in the Contract.  As the United States Court of Appeals for the Third Circuit explained:

> While the parol evidence rule generally prohibits the admission of
> evidence that contradicts the terms of an integrated, unambiguous
> writing, the "rule does not apply to evidence introduced to show that
> a contract was void or voidable." Coleman v. Holecek, 542 F.2d 532,
> 535 (10th Cir. 1976).  Therefore, "events antecedent to the making of
> a contract which negate mutuality of assent, such as duress or fraud,
> or demonstrate a condition to be fulfilled before the obligations of the
> contract are to vest, may also be the subject of parol evidence.  4
> Walter H.E. Jaeger, Williston on Contracts, § 631, at 950 (3d ed.
> 1961).

---

[24] Plaintiff does not allege any change in the work that necessitated more or different labor or trucking.

Connors v. Fawn Mining Corp., 30 F.3d 483, 493-94 (3d Cir. 1994) (emphasis added). Accord In re Cambridge Biotech Corp., 186 F.3d 1356, 1377 (Fed. Cr. 1999) ("When the contractual language is clear and unambiguous, and in the absence of fraud, duress, or mistake, parol evidence is not admissible to show the intention of the parties or to vary, alter, or contradict the terms of that contract."); Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1327 (Fed. Cir. 2003); Starling v. Valmac Industries, Inc., 589 F.2d 382, 386 (8th Cir. 1976) (stating that "where the promissory representations were made fraudulently for the purpose of inducing the party sought to be charged to enter into the contract, such representations may be proved by parol evidence"). Yarn Indus., Inc. v. Krupp Int'l, Inc., 736 F.2d 125, 129 (4th Cir. 1984) (parol evidence is admissible to establish allegations of fraud, mistake, or other equitable relief); see generally, Restatement (Second) of Contracts § 214(d) ("Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . illegality, fraud, duress, mistake, lack of consideration, or other invalidating cause.").

In essence, Plaintiff claims that the Corps coerced it into lowering its pricing in an 8(a) negotiated procurement by promising it an equitable adjustment down the road. Such a claim, while not rising to an allegation of fraud or duress, could, if successful, affect the validity of the Contract and render the Contract void or voidable. As such, the parol evidence rule does not bar evidence of the negotiations here.

Admitting evidence of the negotiations, however, does not further Plaintiff's cause. Corps personnel present at the negotiations credibly testified that they did not promise to grant equitable adjustments for increased labor or trucking costs. Further, El Centro Coffey, the SBA representative who participated in the negotiations on Plaintiff's behalf, did not testify that any such promise was made. At the time of the negotiations, Mr. Coffey was the Assistant District Director for 8(a) Business Development in the New Orleans District Office and was a seasoned SBA veteran having worked at the agency since 1972. Tr. 407-08. Mr. Coffey merely testified that the parties discussed trucking costs and that the Corps representatives agreed to supply PR with lower-priced sources of trucking -- but he did not know whether they ever did. This testimony does not come close to proving that Corps representatives forced Plaintiff to use a $30 per-hour trucking rate in its bid or that they promised an equitable adjustment if PR's costs exceeded this rate. The only evidence suggesting that the Government promised PR an equitable adjustment in the event Plaintiff could not secure labor and trucking at rates it bid is Mr. Patin's testimony. This does not satisfy Plaintiff's burden of proof. It is well established that generalized, conclusive, unsupported opinion testimony commands very little weight when it contains little more than self-serving conclusions. Northbridge Electronics, Inc. v. United States, 195 Ct. Cl. 453, 444 F.2d 1124 (1971).

Moreover, Plaintiff has not proven that its estimates of labor and trucking costs in its bid were in fact lower than the costs it actually incurred. It is not clear what aspects of its bid Plaintiff reduced to arrive at the Contract price. Although Plaintiff claims it was forced to offer Davis-Bacon

wage rates, the record does not establish that it in fact bid Davis-Bacon rates.[25]

The costs Plaintiff supposedly built into its offer for trucking are equally unsupported. Although Plaintiff claims the Corps forced it to bid $30 per hour for trucking, the record does not reflect what trucking rate was used in PR's proposals. Further, it is implausible that the Corps would require PR to bid a rate far below its own Government estimate of $49.94 per hour. Finally, as Mr. Bivona testified, it would have been unnecessary for trucking rates to have been discussed, since these costs were incorporated into the proposal of PR's subcontractor and were not separately identified in PR's bid.

**The Material Shrinkage Factor**

Plaintiff claims that it is entitled to an equitable adjustment of $394,344 because the Government did not take into account the shrinkage of fill material in formulating the unit prices in the Government estimate. Specifically, Plaintiff claims:

> The [Corps'] estimate did not take into account the inevitable shrinkage of the fill material. The problem arises when the [Corps'] "anticipated" unit price does not take into account the extra effort required to move the additional material caused by the shrinkage. PR believes that the [Corps' representatives] failure to consider the shrinkage of material contributed to their insistence of lower unit prices to facilitate granting of the contract. A proper quantity adjustment for shrinkage on the [Corps'] estimate would have allowed for a proportional increase in the final contract unit prices.

Pl. Ex. 4 at 4.

This claim also suffers from a lack of factual and legal support. Plaintiff has proffered no probative evidence the Corps "insisted on lower unit prices [for fill] to facilitate granting of the contract."[26] Neither Mr. Patin nor any other witness testified that the Corps insisted on lower prices

---

[25] Plaintiff's bid packages of July 17, 1996, and September 3, 1996, reflect labor wage rates higher than Davis-Bacon rates. Plaintiff's November 4, 1996 revised proposal and supporting documents are not in the record, and Plaintiff has not proven what labor rates it bid in that proposal.

[26] The preparer of PR's claim, Lin Heath, testified that "regarding whether or not shrinkage was in there originally, that's based upon their negotiations, not on the four corners of a contract document." Heath Depo. at 59. Mr. Patin did not testify about negotiations regarding fill or shrinkage used in developing the unit prices in the Contract. Further, PR's allegation in its claim and the complaint that the Government estimate did not take into account shrinkage was speculative when raised since neither Mr. Patin nor Mr. Heath had seen the Government estimate at the time the claim and complaint were filed -- and thus could not have ascertained whether that estimate had

for fill during negotiations -- the testimony in this vein was confined to labor and trucking.

Plaintiff's claim that the Government's estimated quantities for fill in the Contract failed to account for shrinkage is based in part on Mr. Patin's assertion that Plaintiff "haul[ed] a lot more material to put on the site than was actually paid for." Tr. at 119. However, the Contract states that Plaintiff was to be paid for cubic yards of material placed at the site as opposed to material hauled to the site. Pl.'s Ex. 1; Tr. at 550. The relevant clause of the Contract, clause 15.1.1, reads: "Unless otherwise specified, semicompacted fill and uncompacted fill . . . will be measured for payment by the cubic yard, and quantities will be determined by the average end area method." Pl.'s Ex. 1. This method of measurement reflects how much fill was actually placed at the site. Tr. at 550. As such, Plaintiff is not entitled to be paid based on quantities hauled.

Nor is there credible evidence that the Contract's estimated quantities for uncompacted and semi-compacted fill were too low. The Court recognizes that Mr. Elguezabal's settlement proposals concluded that the Government estimate did not include shrinkage of fill material, but his proposals are directly contradicted by the Government estimate itself and the testimony of the Corps' structural engineer who prepared the estimate, John Bivona. DX 8; DX 9.

Based on a 25% swell factor which he claimed had not been considered, Mr. Elguezabal recommended increasing the unit price to $6.727 and paying PR $164,254.03 for the material shrinkage claim. Pl.'s Ex. 8, 9. Mr. Elguezabal testified:

> THE COURT:      . . . based on [your computations using a table] you concluded that the contractor moved more material that he got paid for?
>
> THE WITNESS:    Yes, it verified that he moved more material. It wasn't a time that it was, yeah, he moved more material, but it also -- what I was going after was the fact is that the allegation of the contractor was that he had -- in the original negotiation he had come in with a price. That price was rejected by the government. He came in with a lower price. That price was rejected by the government, and he came in with a third price if I remember correctly, lower, and looking back at the document over here, I have to say that I must have access to the government estimate, and I did not see that the government had utilized a swell computation to compute the quantity, or the

---

considered shrinkage.

> yardage of material that would have to be
> hauled.  So therefore the government estimate
> for that one item of work would have been
> low compared to what it would actually cost.

Tr. 282-83.

In contrast to Mr. Elguezabal's generalized testimony, the Government demonstrated that shrinkage was factored into the Government estimate.  DX 1/16, DX 1/17, DX 8/14.  Both the Government estimate on its face and Mr. Bivona's testimony establish that shrinkage was considered in the estimate.  Specifically, the Government estimate assumed a haul quantity of 230,000 CY and a pay quantity of 222,000 CY of uncompacted fill for line item 5, and a haul quantity of 67,000 CY and a pay quantity of 61,215 CY of semi-compacted fill in Phase I of line item 6 and a haul quantity of 89,000 CY and a pay quantity of 83,786 CY of semi-compacted fill in Phase III of line item 6. DX 8/14; DX 8/16-18.[27]  Mr. Bivona testified that the bid quantity is estimated by measuring the truckload of dirt that would be used to build the levee, accounting for shrinkage.  Tr. 532-37.  He explained the estimating process:

> We compute what's called the neatline quantity, which is ground line
> to top elevation, knowing that the designer also shows that, but as an
> estimator, we verify that. . . . In essence, the bid quantity includes
> neatline plus settlement.

Tr. at 527-28.  He further explained shrinkage:

> The minute . . . dirt gets loaded via an excavator onto a truck, the
> physical nature of the dirt, not so much the engineering, . . . it will
> expand or swell because you've loosened the particles, and thus it
> expands from 10 to 12 cubic yards. . . .
>
> When it goes to the levee, something happens, and it happens in a
> common-sense scenario because we're now compacting that 10 yards
> of dirt which was not originally compacted in its natural state, so we
> compact it with dozers and other equipment, and what you find is that
> the air particles, the volume decreases, and in essence, that term is
> shrinkage.  We go from 12 yards to eight and a half yards from 10, so
> the volume changes both from the borrow pit and more importantly
> from the truck.  To get eight and a half yards of dirt in an
> embankment requires a delivery of more dirt or 12 cubic yards.

Tr. at 535-36.  Specifically, with respect to the Government estimate here, Mr. Bivona stated:

---

[27]  The pay quantity refers to fill in place at the levee after shrinkage.

Q.      When the bid quantity is estimated -- and again, for Item 5, uncompacted fill is approximately 222,000 cubic yards -- that 222,000 cubic yards estimates both the quantity that makes up the levee as well as a certain amount of material for the settlement of that levee.

A.      That's correct.

Q.      And is there some calculation, is there some way that you figure out what that settlement is?

A.      It's a geotechnical assessment of consolidation of the amount of settlement.   Consolidation is just an engineering term. That means how much will soil compress below the ground line, and that's obtained from historical data or it can be obtained from engineering data, but that is provided to the designer.   What the cost engineer does is make one very important check, and that is that this neatline quantity must be less than the stated bid quantity, because it would mean that it has to include settlement, and thus we can check it off and say the designer is correct, the job can go out on the street and be estimated properly.

Tr. at 530-32.

Mr. Bivona testified that the Government estimate here considered a 30 percent loss when the truck transports the dirt from the borrow pit to the levee site, and a 1.4 loss factor when the dirt goes from the truck to the in-place site.  Tr. 643-44.  Mr. Bivona assumed a 20-cubic-yard truckload would equate to 14 cubic yards in place, which included the shrinkage factor.  DX 1/16-17; Tr. 541. Plaintiff has not demonstrated that either the Corps' methodology for assessing shrinkage or the measure of such shrinkage here was deficient.  Plaintiff is not entitled to recover due to material shrinkage.

## Quantity Under-Run

The final approved and paid quantities for semi-compacted and uncompacted fill were less than 85% of the quantities estimated in the Contract.  Pl.'s Ex. 4.  Plaintiff seeks reimbursement under the VEQ clause for $43,660 in costs -- overhead, profit, bond and taxes -- that it claims it incurred as a result of reliance on the original contract estimates.  Heath Dep. at 31- 34.

The VEQ clause allows for an equitable adjustment when the quantity of a unit-priced item varies by more than 15% below or above the estimate.  See Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); Thermocor, Inc. v. United States, 35 Fed. Cl. 480, 488 (1996).

The clause provides:

> [i]f the quantity of a unit-priced item in this contract is an estimated quantity and the actual quantity of the unit-priced item varies more than 15 percent above or below the estimated quantity, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the variation above 115 percent or below 85 percent of the estimated quantity.

Pl.'s Ex. 1.

In <u>Foley</u>, the Federal Circuit affirmed the trial court's holding that "the grant of an equitable adjustment under VEQ clause requires proof of an actual increase or decrease in <u>costs</u> due solely to the variation above 115 or below 85 percent of the estimated quantity." 11 F.3d at 1033 (emphasis added). The Federal Circuit articulated that the "VEQ clause precludes an equitable adjustment based on anything other than the contractor's costs." <u>Id.</u> at 1034. Thus, the VEQ clause does not automatically allow a contractor to obtain an equitable adjustment once an under-run below 85 percent is established. Rather, the clause provides for compensation when the contractor proves that it has incurred increased costs solely due to the under-run. Plaintiff provided no documentation that its claimed costs for overhead, bond or taxes increased due to the lesser quantity of fill it supplied. Because Plaintiff has not demonstrated either increased costs or any nexus between its alleged increased costs and the under-run, it cannot recover under the VEQ clause.

## **Additional Fill Due to Settlement**

Plaintiff's final claim is that it is due compensation as a result of settlement of material at the construction site. The Contract provided that Plaintiff would be compensated for additional fill material due to foundation settlement if settlement plates were installed before work began and measurements were taken within 72 hours after compliance cross-sections were taken. The Contact precluded recovery for settlement in areas where settlement plates were not recovered, stating:

> Failure to utilize settlement gages in strict accordance with the specifications and drawings will result in total forfeiture of any payment which may otherwise be due the Contractor for settlement of the foundation. In each case of . . . failure to recover any settlement gage . . . payment will be totally forfeited for the reach attributable to each gage so affected.

Pl.'s Ex. 1.

A total of 157 plates were placed at the construction site, but 81 plates were lost. Plaintiff has been compensated for excess material placed at the locations where the plates were recovered.

Plaintiff seeks $113,906 for additional fill due to settlement, based not upon measurements from settlement plates but upon the average of the settlement documented in the areas where plates had been recovered. Tr. at 122-23. Because Plaintiff lost the settlement plates and did not comply with the Contract's clear prerequisite for recovery, it is not entitled to an equitable adjustment for settlement of fill material.

Plaintiff, however, attempts to avoid the Contract's requirements, in essence claiming that the Government prevented it from complying with the Contract. Plaintiff asserts that because the Government forced it to hire a surveyor who was fired and absconded with the log books detailing the location of the settlement plates, the Government prevented it from substantiating its claim in the manner required by the Contract. The evidence, however, does not support a conclusion that the Government required PR to hire Mr. Case. Rather, both Mr. Elguezabal and Mr. Siffert testified that they warned Mr. Patin of Mr. Case's problematic work history, but Mr. Patin hired him despite such warning. As such, any problem PR had with its surveyor was not the fault of the Government, and does not excuse Plaintiff's noncompliance with the Contract.

**Interference**

During trial, it was unclear whether Plaintiff was attempting to raise an interference claim which had not been presented to the contracting officer, and the Court questioned whether such claim was properly before it. Tr. at 941-42.

It is well settled that the submission of a claim to the contracting officer by the contractor is a jurisdictional prerequisite to maintaining a suit under the CDA and that a contractor's failure to do so requires that its action be dismissed. United States v. Grumman Aerospace Corp., 927 F.2d 575, 579 (Fed. Cir. 1991), cert. denied, 502 U.S. 919 (1991); Ball, Ball & Brosamer, Inc. v. United States, 878 F.2d 1426, 1428 (Fed. Cir. 1989). Thus, "a contractor may not present a claim to this court that was not first presented to the contracting officer for a final decision." Modeer v. United States, 68 Fed. Cl. 131, 137 (2005). However, a claim presented to this Court is not a new claim if it arises from the same operative facts and seeks the same categories of relief as the original claims. Scott Timber Co. v. United States, 333 F.3d 1358, 1365 (Fed. Cir. 2003).

In its post-trial brief Plaintiff addressed its interference claim as follows:

GOVERNMENT INTERFERENCE:

Mr. Patin was told not to assert a specific government interference claim because the items brought out would cause the government to be more resistant to settling. Mr. Patin did not specifically set out a government interference claim, but shows that an equitable adjustment for materials, work and labor actually provided on the job are due because of miscalculations in the estimate, as well as interference by the government in the performance of the job. The

25

> reasons for the underpayment are directly traceable to government
> miscalculations and interference in this project.

Pl.'s Post-trial Br. at 8.  It appears that Plaintiff acknowledges that it is not lodging a separate interference claim.  Plaintiff has not sought any additional or different relief stemming from interference beyond its $865,156 claim representing the five categories of increased costs discussed above.  Rather, PR cites interference in support of its pending claims, -- contending that miscalculations in the Government estimate and actions of the surveyor support its entitlement to recover additional costs for trucking, labor, material shrinkage and settlement.  As such, the Court does not construe Plaintiff's allegations of interference as a separate claim for relief but rather as evidence mustered in support of existing claims.

## Conclusion

Plaintiff's claim for relief is denied in its entirety.  The Clerk is directed to enter judgment for Defendant.  No costs.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**